**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GENE T. DRAKE**, | : | Case No. 1:14CV0001 |
| Plaintiff, | : | |
| vs. | : | **MEMORANDUM DECISION** |
| | | **AND ORDER** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER,** | : | |
| **OF SOCIAL SECURITY,** | | |
| Defendant. | : | |

## I. INTRODUCTION.

Plaintiff seeks judicial review of a final decision of the Commissioner denying his application for Supplemental Social Security Income (SSI) and any State supplementation under Title XVI of the Social Security Act (the Act), 42 U. S. C. § 1381, *et seq*. and 405(g).  Pending are Briefs on the Merits filed by both parties (Docket Nos. 15 & 17).  For the reasons set forth below, the Magistrate affirms the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

On December 3, 2009, Plaintiff filed an application for SSI alleging that his disability began on September 1, 2009 (Docket No. 11, pp. 123-125 of 474).  His claim was denied initially on March 17, 2010 and upon reconsideration on September 2, 2010 (Docket No. 11, pp. 67-69, 73-75 of 474).  Plaintiff requested a hearing and on September 1, 2011, Administrative Law Judge (ALJ) C. Howard Prinsloo conducted a video hearing at which Plaintiff, represented by counsel, and Vocational Expert (VE) Dr.

Mona Robinson, appeared and testified (Docket No. 11, p. 35 of 474).  The ALJ issued an unfavorable decision on November 29, 2011 (Docket No. 11, pp. 16-18 of 474).  The Appeals Council denied Plaintiff's request for review on March 22, 2013, thereby rendering the ALJ's decision the final decision of the Commissioner (Docket No. 11, pp. 10-12 of 474).

## III. FACTUAL BACKGROUND.

### A.    PLAINTIFF'S TESTIMONY

Plaintiff was 39 years of age.  He lives with his girlfriend and their three children, ages 18, 17 and 15.  While in school, Plaintiff was considered a special needs student with a learning disability; however, he successfully completed the 11[1] grade in Special Education classes[1]   (Docket No. 11, pp. 40, 44, 52, 53 of 474).

Plaintiff's work history included jobs primarily in the shipping and demolition industries.  In 2001 and 2002, Plaintiff was employed at Prestige Delivery, a company which provides same day and next day delivery and logistic services.  He performed a wide range of job duties, including shipping, receiving, packaging and delivering goods. Plaintiff also loaded and unloaded trucks and entered data in the computer (Docket No. 11, p. 49 of 474).  In 2007 and 2008, Plaintiff was employed as a remodeling contractor.  In that capacity, he demolished, remodeled and cleaned-up housing sites (Docket No 11, pp. 50-51 of 474).  For several months, Plaintiff was employed by his stepfather's company assisting with the retrieval of mail from the post office and delivery to designated companies. (Docket No. 11, p. 51-52 of 474).

In September 2009, Plaintiff was involved in a motorcycle accident and sustained a fractured

---

[1]

The educational records show that Plaintiff was born on February 18, 1972 and he withdrew from the East Cleveland City Schools on October 2, 1992 in the 12[1] grade after attempting to earn 29.250 credits and successfully completing 8.25 credits toward his diploma.  The record further shows he was committed to the Southeastern Correctional Institutional on July 29, 1993 (Docket No. 11, pp. 186-188 of 474).

femur which precipitated arthritis in the hips, legs and back. The pain was excruciating and chronic and occasionally resulted in leg paralysis. The leg paralysis had caused Plaintiff to fall five times during the preceding month and to ultimately to refrain from driving. While testifying, Plaintiff displayed hearing loss symptoms (Docket No. 11, pp. 40, 41, 42, 51-52 of 474).

Plaintiff was evaluated for pain management and also had epidural injections in his back. The comprehensive aftercare plan, designed to relieve pain, swelling and periodic paralysis, included therapeutic treatment modalities such as wearing a hinged knee brace, ambulating with a cane, applying heat and cold therapy, undergoing formal physical therapy two times weekly, lying in bed and performing home exercises. The supplemental drug therapy consisted of *inter alia*, Lyrica, Hydrocodone, Motrin, Celebrex, Percocet and Pregabalin. According to Plaintiff, this regimen did little to moderate the intensity of Plaintiff's pain. He could generally sleep up to three successive hours before he had to replenish his medication (Docket No. 11, pp. 41, 42-44, 46, 47-48, 55-56 of 474).

Plaintiff testified that his pain was minimized when lying in bed and when sitting, he could control the swelling and pain by elevating his legs. Consequently, his exertional limitations included the following: (1) ability to stand for 20 minutes; (2) ability to sit for 30 minutes before elevating his feet; and (3) ability to walk up to 30 to 40 minutes before sitting and elevating his feet (Docket No. 11, pp. 42-43, 57 of 474). At home, Plaintiff was responsible for washing dishes, doing laundry, vacuuming and dusting. Because he could not stand for long periods of time, Plaintiff washed clothing in the basement where he had a recliner and a television (Docket No. 11, pp. 44-45 of 474).

### B.    VE TESTIMONY.

The VE, a certified rehabilitation counselor, classified Plaintiff's past relevant work of shipping and receiving with tow responsibilities as an industrial truck operator as defined in the DICTIONARY OF

3

OCCUPATIONAL TITLES (DOT).[2]  For DOT purposes, the VE classified Plaintiff's position of a rehabilitation specialist as a construction worker (Docket No. 11, p. 60 of 474).

The ALJ posed the *first* hypothetical question as follows:

Assume an individual of Plaintiff's age, same education and same past work experience, who has the functional capacity for sedentary work but is limited to simple, routine and repetitive tasks.  Would this individual be able to perform Plaintiff's past relevant work?

The VE responded that this hypothetical person could not perform Plaintiff's past relevant jobs.  However, there would be sedentary occupations at the unskilled level that a worker residing in the Northern Ohio Region 8 could learn the techniques, acquire the information, and develop the facility needed for average performance in this job, after a short demonstration and up to one month:

| OCCUPATION/DOT | REGION | STATE OF OHIO | NATIONAL ECONOMY |
|---|---|---|---|
| SORTER/521.687-086 | 500 | 4,000 | 50,000 |
| ASSEMBLER/706.684-030 | 300 | 12,000 | 130,000 |
| MACHINE TENDER/689.585-018 | 1,500 | 25,000 | 250,000 |

(Docket No. 11, pp. 60-61 of 474).

Counsel proposed that the same hypothetical person would need to lift his right leg at least to a 90-degree angle directly in front of him.  The VE responded that without spatial accommodations, the unskilled [jobs] in those particular occupations would not accommodate the elevation of the leg while working (Docket No. 11, p. 62 of 474).  However, the elevation of the leg could be an accommodation in the clerical setting.  The number of jobs that would accommodate the hypothetical claimant are:

---

[2]

DOT is a compilation of data and definitions in selected industries that provides the best "snapshot" of how jobs are performed in the majority of industries across the country.  Www.occupationalinof.org/

4

| OCCUPATION/DOT | REGION | STATE OF OHIO | NATIONAL ECONOMY |
|---|---|---|---|
| DOCUMENT PREPARER/249.587-018 | 1,500 | 15,000 | 150,000 |
| ADDRESSER/209.587-010 | 500 | 4,000 | 50,000 |
| CHARGE CLERK/205.367-014 | 1,500 | 15,000 | 150,000 |

(Docket No. 11, pp. 61, 62 of 474).

Assuming that the hypothetical person would need additional breaks up to two times per day to apply ice or heat to the lower extremity, the VE opined that the employer would generally not accommodate extra breaks outside what was regularly scheduled (Docket No. 11, p. 63 of 474).  Assuming that the same hypothetical person would be off task 20 percent of the time, either because he had to get up and move around or because of pain, the VE opined that such accommodations would preclude work at the unskilled, sedentary exertional level (Docket No. 11, p. 62 f 474).

## IV.  PLAINTIFF'S MEDICAL HISTORY.

Plaintiff's medical problems can be traced back to September 1, 2009, when he was in a motorcycle accident and sustained multiple trauma including loss of consciousness, a fractured right femur and moderate pain to the right ankle and right foot (Docket No. 11, pp. 266-279 of 474).  Diagnostic tests of the brain, cervical spine, abdomen and pelvis were administered, revealing that:  (1) the abdomen and pelvis were within normal limits (Docket No. 11, pp. 353-357 of 474); (2) the brain was normal in appearance, there was no bleeding or mass effect within the skull, and there were no collections situated or occurring beneath the dura matter (Docket No. 11, pp. 347-349 of 474) and (3) the cervical spine was normal in appearance (Docket No. 11, pp. 350-352 of 474).  On September 2, 2009, Plaintiff underwent rodding surgery which involves the internal splinting of the long bones by means of inserting a metal rod (Docket No. 11, pp. 339-345 of 474).  When cleared from a trauma standpoint, Plaintiff was discharged on September 9, 2009 to a skilled nursing facility (Docket No. 11, pp. 191-192, 280-333 of 474).

On September 11, 2009, Plaintiff presented with right thigh pain arising from the femoral shaft and a toothache.  Results from the radiological evaluation showed no evidence of deep vein thrombosis (Docket No. 11, p. 229 of 474).  He was prescribed Percocet and an antibiotic used to treat bacterial infections (Docket No. 11, pp. 206-207 of 474).

Plaintiff showed signs of memory loss and cognitive linguistic deficits; therefore, a speech pathologist conducted an evaluation on September 14, 2009.  The results of such examination showed functional voice and speech but an impaired ability to understand or comprehend language and put thoughts into words and sentences that made sense or were grammatically accurate (Docket No. 11, pp. 220-223 of 474).

A physical therapist from the Legacy Health Services Restorative/Functional Maintenance Program conducted an evaluation on September 17, 2009, to assess how Plaintiff was progressing with self-care.  For instance, some of the therapist's instruction included use of the counter tops to push up and support Plaintiff while standing (Docket No. 11, pp. 216-219 of 474).

With respect to physical rehabilitation, a physical therapist conducted evaluations on September 17, 2009 and September 24, 2009 (Docket No. 11, p. 224 of 474).  With the exception of some stiffness, Plaintiff showed the ability to perform the exercise program.  Plaintiff's home plan of care included physical therapy, recreation therapy and occupational therapy.  Plaintiff was given a standardized walker to assist ambulation (Docket No. 11, pp. 199-205, 208, 209, 211, 220 of 474).  Plaintiff used a wheelchair to move from place to place on September 18, 2009 (Docket No. 11, pp. 262-264 of 474).

Plaintiff's fracture was well healed on October 14, 2009.  Notably, there was near anatomic alignment of the femur and improvement of the previously seen displacement (Docket No. 11, pp. 334-337 of 474).

Julie Gruden, a physical therapist, conducted a home visit on October 16, 2009 and determined that

Plaintiff required self-care assistance because of his immediate functional limitations and severe pain. Ms. Gruden assisted Plaintiff with a therapy plan designed to decrease the pain, identify aggravating and alleviating factors and increase strength (Docket No. 11, pp. 257-259 of 474). Thereafter, Plaintiff reported to licensed physical therapist assistant, Laverne Bell, twice weekly for eight weeks. From approximately October 16, 2009, through November 30, 2009 and on December 31, 2009, Ms. Bell executed a treatment plan in which she used stretches, flexion exercises, curls and leg presses to increase range of motion and improve function. Incorporated into the routine was use of a treadmill, Airdyne bicycle, recumbent bicycle and trampoline. At the conclusion of each session, Ms. Bell typically applied a cold pack to relieve and/or control swelling and pain. Generally, Plaintiff tolerated each treatment well (Docket No. 11, pp. 234-235, 236-237, 237-238, 239-240, 241-244, 245-246, 247-249, 250-253, 254-255, 255-257 of 474).

Plaintiff presented to Dr. Daniel Harmon, D.O., a specialist in orthopedic surgery, on January 13, 2010, complaining of "some" pain over the distal lateral femur and weakness in the right quadriceps. Dr. Harmon prescribed a cane and recommended continued physical therapy focused on strengthening the quadriceps mechanism (Docket No. 11, pp. 397-399 of 474).

On January 13, 2010, Dr. Conrad S. Revak, M.D., a radiologist, administered certain tests that showed no evidence of a new fracture or mal-alignment of the femur(Docket No. 11, pp. 406-408 of 474; www.healthgrades.com/physician/dr-conrad-revak).

Dr. Sanford M. Timen, M.D., an ear, nose and throat specialist, performed an endoscopy to determine the etiology of chronic tonsillitis and sleep disordered breathing on January 18, 2010. There was some evidence of weakened sections of the airway (Docket No. 11, pp. 390-392 of 474).

On February 3, 2010, Plaintiff underwent a tonsillectomy to remedy chronic tonsilitis (Docket No. 11, pp. 389, 400 of 474). On February 24, 2010, Dr. Timen determined that Plaintiff was recovering

appropriately (Docket No. 11, pp. 385-386, 388 of 474).

On April 21, 2010, Plaintiff presented to Dr. David H. Krahe, D.O., a specialist in orthopedic surgery, complaining that his knee/leg "gave way."  There was no evidence of degenerative changes in the knee and the fracture appeared to be healing satisfactorily.  Dr. Krahe prescribed a hinged knee brace (Docket No. 11, pp. 382-383, 402 of 474; www.healthgrades.com/physician/dr-david-krahe).

The radiological imaging of the spine taken on April 29, 2011, showed minimal degenerative changes, with no significant central narrowing; foraminal narrowing greatest at mild-moderate right L5-S1; and small posterior midline protrusion at L4-5 (Docket No. 11, pp. 413-414 of 4747).

On May 3, 2010, Ms. Gruden conducted a home visit and determined that there were some activities such as cooking, self care and yard work that Plaintiff could do without difficulty.  However, Plaintiff had difficulty controlling his pain in the right lower extremity with prolonged weight bearing (Docket No. 11, pp. 378-381 of 474).  Further physical therapy was ordered and from May 11, 2010, through May 24, 2010, Ms. Bell and Ms. Gruden administered many of the traditional exercises including flexion, mini squats, use of the Airdyne bicycle and use of a treadmill.  Plaintiff tolerated the exercises well (Docket No. 11, pp. 371-377 of 474).

On June 1, 2010, presented to physical therapy with right lower extremity pain.  Ms. Bell conducted a session with the Airdyne, leg presses and the treadmill.  Plaintiff tolerated the procedure well (Docket No. 11, pp. 431-432 of 474).

Plaintiff's knee "gave way" again in late July.  On August 11, 2010, Dr. Harmon prescribed pain medication and instructed Plaintiff to continue with activities as tolerated (Docket No. 11, pp. 426-427 of 474).

On October 27, 2010, Plaintiff was diagnosed with complex pain syndrome.  Dr. Krahe prescribed Lyrica for pain management (Docket No. 11, pp. 423-424 of 474).

8

On August 2, 2011, Plaintiff presented to Dr. Sumit Katyal, M.D., at Cleveland Clinic Foundation's Pain Management Center, complaining of lower back pain, bilateral hip pain and bilateral knee pain. The results from the radiological tests showed minimal degenerative changes with no significant central narrowing; foraminal narrowing greatest at mild moderate right L5-S1; and small posterior midline protrusion L4-5 contacts without displacement descending left L5 nerve. Ultimately Dr. Katyal diagnosed Plaintiff with lumbago, gave him a prescription for Mobic to assist with joint pain and stressed the importance of rehabilitation through continued physical therapy (Docket No. 11, pp. 451-455 of 474).

On August 11, 2011, Jeanne Markusic, a physical therapist, conducted an evaluation and determined that Plaintiff had significant decreased right hip range of motion and right leg flexibility strength. Given a prescription for thirty sessions, Ms. Markusic planned to focus on improving musculoskeletal pain by addressing deficits in flexibility and strength along with posture and body mechanics (Docket No. 11, pp. 446-450 of 474).

Dr. J. Joseph Konieczny, Ph.D., a psychologist, conducted an evaluation on September 23, 2011, during which he administered the Wechsler Adult Intelligence Scale-IV (WAIS) and conducted a clinical interview. Although the standardized test results placed Plaintiff in the extremely low range of adult intellectual functioning or mild mental retardation, Dr. Konieczny rejected these results, suggesting that emotional and motivational factors may have interfered with Plaintiff's performance. Rather, Plaintiff's true level of intellectual functioning appeared to be in the borderline intellectual functioning arena. When assessing Plaintiff's apparent level of adaptive functioning, Dr. Konieczny opined that Plaintiff had:

1.  Mild deficits in the ability to understand and remember simple instructions and carry out simple instructions.
2.  Difficulty in maintaining focus and persistence in moderately complex multi-step tasks
3.  Diminished tolerance for frustration and diminished coping skills that would impact his ability to respond to typical pressures in the work place.

9

4.   A global assessment of functioning (GAF) 0f 46 indicating serious symptoms (ex: suicidal ideation, severe obsessive rituals) or any serious impairment in social, occupational, or school functioning (ex: no friends, unable to hold a job).

5.   Marked inability to respond appropriately to ususal work situations and to changes in a routine work setting.

(Docket No. 11, pp. 434-439; 440-442 of 474 of 474; www.healthgrdes.com/provider/john-konieczny; www.gaf.com).

On September 28, 2011, Dr. Delorise Brown, an internist, corroborated Dr. Katyal's diagnoses of lumbago and treated Plaintiff's complaints of lower leg and joint pelvic region and thigh pain with medications typically prescribed for muscle spasm control and pain relief. She recommended that Plaintiff continue physical therapy (Docket No. 12, pp. 469-471 of 474; www.healthgrades.com/physician/dr-delorise-brown). In addition, Dr. Brown completed a PHYSICAL RESIDUAL FUNCTIONAL CAPACITY assessment, basing her responses on how Plaintiff's physical capabilities and his ability to do work-related activities on a day-to-day basis in a regular work setting were affected by his impairments. Dr. Brown determined that Plaintiff had the maximum ability to:

1.   lift/carry ten pounds on an occasional basis.
2.   lift/carry on a frequent basis less than ten pounds.
3.   stand/walk about four hours.
4.   sit (with normal breaks) about six hours during a six-hour day.
5.   sit for 30 [minutes] before alternating between sitting/standing or walking.
6.   stand for 30 [minutes] before alternating between sitting/standing or walking.

Moreover, she opined that Plaintiff could reach frequently and push/pull occasionally; that he should have the ability to shift positions at will from sitting or standing/walking; and that he needed to lie down at unpredictable intervals during a work shift. Dr. Brown contemplated that Plaintiff would be absent more than three times monthly (Docket No. 11, pp. 473-474 of 474).

## V.  THE FIVE STEP SEQUENTIAL EVALUATION.

The Social Security Act sets forth a five-step sequential evaluation process for determining

whether an adult claimant is disabled under the Act. *See* 20 C.F.R. § 416.920(a) (West 2014); *Miller v. Commissioner of Social Security*, 2014 WL 916945, *2 (N.D. Ohio 2014). At step one, a claimant must demonstrate she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)(*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). At step two, the claimant must show that she suffers from a "severe impairment.*" Id.* A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott*, 905 F.2d at 923). At step three, the claimant must demonstrate that her impairment or combination of impairments meets or medically equals the listing criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(d) (West 2014). If the claimant meets her burden she is declared disabled, however, if she does not, the Commissioner must determine her residual functional capacity. 20 C.F.R. § 416.920(e) (West 2014).

A claimant's residual functional capacity is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a) (West 2014). In making this determination, the regulations require the Commissioner to consider all of the claimant's impairments, including those that are not "severe." 20 C.F.R. § 416.945(a)(2) (West 2014). At the fourth step in the sequential analysis, the Commissioner must determine whether the claimant has the residual functional capacity to perform the requirements of the claimant's past relevant work. 20 C.F.R. § 416.920(e) (West 2014). Past relevant work is defined as work the claimant has done within the past 15 years (or 15 years prior to the date of the established disability), which was substantial gainful work, and lasted long enough for the claimant to learn to do it. 20 C.F.R. §§ 416.960(b), 416.965(a) (West 2014). If the claimant has the RFC to perform her past work, the claimant is not disabled. 20 C.F.R. § 416.920(f) (West 2014). If, however; the claimant lacks the RFC to perform her past work, the analysis proceeds to the fifth and final step. *Id.*

The final step of the sequential analysis requires the Commissioner to consider the claimant's

11

residual functional capacity, age, education, and work experience to determine whether the claimant can make an adjustment to other work available.  20 C.F.R. §§ 416.920(a)(4)(v), (g) (West 2014).  While the claimant has the burden of proof in steps one through four, the Commissioner has the burden of proof at step five to show "that there is work available in the economy that the claimant can perform."  *Her v. Commissioner of Social Security*, 203 F.3d 388, 391 (6ᵗʰ Cir. 1999).  The Commissioner's finding must be "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6ᵗʰ Cir. 1987)(citation omitted).  If a claimant can make such an adjustment the claimant will be found not disabled.  20 C.F.R. §§ 416.920(a)(4)(v),  (g) (West 2014).  If an adjustment cannot be made,  then the claimant is disabled. *Id.*

## VI.  SUMMARY OF THE ALJ'S DECISION.

Upon consideration of the entire record, the ALJ made the following findings.

1.  Plaintiff had not engaged in substantial gainful activity since November 20, 2009, the application date.

2.  Plaintiff had the following severe impairments:
    A.  "S/P right femur fracture."
    B.  Borderline intellectual functioning.

3.  Plaintiff did not have an impairment or combination of impairments that meets or medically equaled the severity of one of the listed impairments in 20 C.F. R. Part 404, Appendix 1 to Subpart P.

4.  Plaintiff had the residual functional capacity to perform sedentary work except that he is limited to simple, routine, repetitive tasks.

5.  Plaintiff was unable to perform any past relevant work.

6.  Plaintiff, a younger individual aged 18-44, had a limited education and was able to communicate in English.

7.  Considering Plaintiff's age, education, work experience and residual functional capacity, there  are jobs that exist in significant numbers in the national economy that Plaintiff can

perform.

8.    Plaintiff had not been under a disability as defined in the Act, since November 20, 2009, the date of application.

(Docket No. 12, pp. 19-30 of 474).

## VII. STANDARD OF JUDICIAL REVIEW.

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security is not *de novo*. *Norman v. Astrue,* 694 F.Supp.2d 738, 740 (N.D.Ohio,2010).  Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his or her decision and if there is substantial evidence in the record to support his or her findings.  *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir.2005)).

"Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S.Ct. 1420, 1427 (1971)).  The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence.  *Id.* at 740-741.  To determine whether substantial evidence exists to support the ALJ's decision, a district court neither tries the case *de novo*, resolves conflicts in evidence, nor decides questions of credibility.  *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir.2007)).  The district court must not focus, or base its decision, on a single piece of evidence, *Id.*, but the court must consider the totality of the evidence on record.  *Id.* (*See Allen v. Califano*, 613 F.2d 139 (6th Cir.1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir.1978)).

If there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact. *Id.* In fact, the Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers.  *Id.*  It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts."  *Id.* (*citing Mullen v. Bowen*, 800

13

F.2d 535, 545 (6th Cir.1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir.1984)) (emphasis

added)).    Therefore, an ALJ's decision "cannot be overturned if substantial evidence, or even a

preponderance of the evidence supports the claimant's position, so long as substantial evidence also

supports the conclusion reached by the ALJ." *Id.* (*citing Jones v. Commissioner of Social Security*, 336

F.3d 469, 477 (6th Cir.2003)).   Even if the decision is supported by substantial evidence the decision will

not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices

a claimant on the merits or deprives the claimant of a substantial right."   *Id.* (*citing Bowen v.

Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VIII. DISCUSSION

### 1.    THE ALJ DID NOT ERR IN FAILING TO CONSIDER LISTING 1.02A OR B.

Plaintiff argues that his knee impairment meets or equals Listing 1.02 A or B.  Specifically,

Plaintiff's right leg injury satisfies the criteria of this Listing

At step three of the disability evaluation process, the Commissioner must consider whether a

claimant's impairments meet or equal any of the relevant listing requirements of 20 C.F.R. Part 404,

Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(a), 416.920(a) (West 2014).  For a claimant to show that

his impairment matches a listing, it must meet *all* of the specified medical criteria. *Sullivan v. Zebley*, 110

S.Ct. 885, 891 (1990)).  An impairment that manifests only some of those criteria, no matter how severely,

does not qualify.  *Id*.

Listing 1.02 (major dysfunction of a joint) is "characterized by gross anatomical deformity ( e.g.,

subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with

signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate

medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected

joint(s)." With:

14

A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

or

B.  Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c. 20 C.F.R. § 404, Subpart P, Appx 1 § 1.02.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.02.

Section 1.00B2b defines the "inability to ambulate effectively" as follows:

(1) ... [A]n extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.* at § 1.00B2b.

The Magistrate finds that the ALJ was not required to consider Listing 1.02A or B of the listing because Plaintiff's leg impairment did not meet *all* of the specified medical criteria. For instance, Listing 1.02A requires a "gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability)." Plaintiff has not argued or even attempted to demonstrate he suffers from a "gross anatomical deformity." Listing 1.02B requires an inability to ambulate effectively for at least 12 months or the inability to perform fine and gross movements effectively. The regulations provide examples of an inability to ambulate which includes an inability to walk without the use of a walker or two canes. By his

15

own admission, Plaintiff ambulates quite independently and effectively without the assistance of one cane and he maintains sufficient ability to perform fine and gross movements to carry out activities of daily living, such washing dishes and clothing, performing light chores, and maintaining his personal hygiene.

Plaintiff has not met his burden of establishing that his impairments meet the requirements of Listing 1.02A or B.  The ALJ's failure to find that Plaintiff's impairments meet or equal Listing 1.02A or B reflects consideration of all relevant evidence as required by the regulations.

        2.      **THE ALJ DID NOT ERR IN FAILING TO CONSIDER LISTING 1.03**.

The Magistrate finds that Listing 1.03 was not mentioned or discussed by the ALJ.  However, it remains clear that the ALJ did not consider Plaintiff's impairments under 1.03 for the reason that after taking into consideration the definitions and guidelines contained in the Listing, Plaintiff's impairments did not meet all the specified medical criteria.

Listing 1.03 specifically requires, "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset."  20 C.F.R. 404, Subpt. P, App. 1 § 1.03 (Thomson Reuters 2014).  At its most basic level, counsel has crafted an argument which ignores that even if the rodding surgery is tantamount to reconstructive fusion surgery, these procedures did not involve a weight-bearing joint.  None of Plaintiff's treating physicians address the requirements of Listing 1.03.  Plaintiff's testimony does not align with the requirements of Listing 1.03.  Once again, under the circumstances of this case, substantial evidence supports the ALJ's decision not to consider Listing 1.03.

        3.      **THE ALJ DID NOT ERR IN FAILING TO FIND PLAINTIFF DISABLED UNDER LISTING 12.05.**

Plaintiff concedes that he does not strictly comply with Listing 12.05 by functioning at a level exceeding his IQ score; however, such score is not conclusive.  Plaintiff challenges the ALJ's failure to

assess alternate forms of measuring intellect such as his GAF, participation in special education services

and his poor academic performance when determining  whether he meets Listing 12.05.

Listing 12.05, 20 C.F.R. Pt. 404, Subpt. P, App. 1, states, in pertinent part:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.  The required level of severity for this disorder is met when the requirements in A, B, C or D are satisfied.

A.    Mental incapacity evidenced by dependence upon others for personal needs and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded.
Or
B.    A valid verbal, performance, or full scale IQ of 59 or less.
OR
C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.
OR
D.    A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
    1.    Marked restriction of activities of daily living; or
    2.    Marked difficulties in maintaining social functioning; or
    3.    Marked difficulties in maintaining concentration, persistence, or pace; or
    4.    Repeated episodes of decompensation, each of extended duration.

Adaptive functioning includes a claimant's effectiveness in areas such as social skills,

communication and daily living skills and how well the claimant meets the standards of personal

independence and social responsibility expected of his or her age.  *Heller v. Doe by Doe*, 113 S. Ct. 2637,

2647 (1993).

The Magistrate is persuaded that the ALJ discounted the relevance of Plaintiff's poor academic

performance and special education classes in determining the extent of Plaintiff's impairments because

they suggest subaverage intellectual functioning and not deficits in adaptive functioning.  Plaintiff points

to no authority holding that his poor academic performance and attendance in special education classes

demonstrate a deficit in adaptive functioning.

With respect to the GAF score, Plaintiff fails to point to Social Security regulations or case law that requires an ALJ to determine the extent of a person's borderline intellectual functioning based entirely or in part, on his GAF score. The GAF is a tool used to assess a person's psychological, social and occupational function on a continuum of mental illness. The GAF score is merely a snapshot of a person's overall psychological functioning at or near the time of the evaluation. The score represents a clinician's judgment and does not correlate with the severity requirements of the mental disorders listing. The ALJ was not required to assign any weight to the GAF scores, use it to determine disability or use it as an adjunct in determining if Plaintiff's impairments met the Listing.

Plaintiff's raw scores on the WAIS were within the mental retardation range; however, they were rejected by Dr. Konieczny who diagnosed Plaintiff with borderline intellectual functioning. The ALJ was entitled to rely on this contradictory language in determining whether Plaintiff's overall adaptive function was more in line with borderline functioning than mental retardation. The ALJ was not persuaded by Plaintiff's poor academic performance, participation in special education classes or GAF score, that Plaintiff had concurrent deficits in two or more areas of adaptive behavior, a medical prerequisite for the mental retardation classification. Most significantly, Dr. Konieczny's clinical evaluation demonstrated that Plaintiff had the adaptive ability to function in his environment in areas of home living, self care and health and safety.     Contrary to Plaintiff's assertion, the ALJ considered all of the evidence, including school records showing special education classes, poor academic performance and GAF score, to determine that Plaintiff's deficits were not of the severity to be disabling under Listing 12.05.

### 4.   THE ALJ DID NOT ERR IN FAILING TO CONSIDER THE COMBINATION OF LISTING 1.02A OR B, 1.03 AND 12.05.

Plaintiff argues that the ALJ erred in failing to consider the combined effect of his Listed

impairments.  The combined effect of all of the individual's impairments must be considered in determining whether a claimant is severely impaired so as to be considered disabled, without regard to whether any of these impairments, if considered separately, would be of such severity.  42 U.S.C. § 423(d)(2)(B) (West 2014).  If the Commissioner does find that a medically severe combination of impairments exists, the combined impact of the impairments must be considered throughout the disability determination process.  *Id.*  A claimant may demonstrate that he or she is disabled as a result of a combination of impairments that are the equivalent to a listed impairment, by presenting medical findings equal in severity to all of the criteria for the one, most similar, listed impairment.  *Foster v. Halter,* 279 F. 3d 348, 355 (6th Cir. 2001) (*citing Sullivan v. Zebley*, 110 S. Ct. 885, 891-892 (1990)).

Plaintiff claims that the ALJ failed to undertake such analysis while at the same time failing to offer a plausible theory or point to credible evidence as to how his arthritis, lumbago and knee pain combined with his femur fracture and borderline intellectual functioning equal a listed impairment.  The Magistrate finds that Plaintiff's argument is unpersuasive when reading the ALJ's decision as a whole.  The ALJ identified the statutory and regulatory scheme for making disability determinations which required that he consider the combined effect of all Plaintiff's impairments in determining his disability status.  He then considered Plaintiff's non-severe impairments of arthritis, lumbago and knee pain separately followed by the broader combined effect of Plaintiff's severe impairments including the femur fracture and borderline intellectual functioning.

Plaintiff cannot prevail on this issue because the ALJ gave cogent reasoning for his conclusions and his conclusions are not based on incorrect legal standards.  The Magistrate finds that the ALJ's finding is entitled to particular deference since Plaintiff has not overcome the weight of that deference with evidentiary support or case authority.  In conclusion, Plaintiff's claim that the ALJ failed to evaluate his impairments in combination is without merit.

### 5.      THE ALJ DID NOT ERR IN HIS STEP FOUR ANALYSIS.

The ALJ found that Plaintiff had the residual functional capacity to perform sedentary work except that he is limited to simple, routine and repetitive tasks.  Plaintiff argues that the ALJ would have arrived at a more appropriate restrictive residual functional capacity if the ALJ had considered all of the pertinent evidence in the record, namely, the opinions of Drs. Konieczny and Brown.

The Commissioner's regulations for assessing residual functional capacity when an individual has a mental impairment is set forth in 20 C.F.R. § 404.1545 and Social Security Regulation (SSR) 85-16, TITLES II AND XVI: RESIDUAL FUNCTIONAL CAPACITY FOR MENTAL IMPAIRMENTS, 1985 WL 56855 (1985). 20 C.F.R. § 404.1545 provides:

> Mental abilities.  When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis.  A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work.

Expanding on this, SSR 85–16 sets forth what evidence the Commissioner should consider when assessing a claimant's mental residual functional capacity, and provides:

> The determination of mental RFC involves the consideration of evidence, such as:
>
> • History, findings, and observations from medical sources (including psychological test results), regarding the presence, frequency, and intensity of hallucinations, delusions or paranoid tendencies; depression or elation; confusion or disorientation; conversion symptoms or phobias; psycho physiological symptoms; withdrawn or bizarre behavior; anxiety or tension.
> • Reports of the individual's activities of daily living and work activity, as well as testimony of third parties about the individual's performance and behavior.

> *Id.* at *2.

Here, the ALJ found that Plaintiff's history of borderline intelligence constituted a severe impairment, and he documented his decision as required by 20 C.F.R. § 416.920a(e)(2) (Docket No. 11,

pp. 22-23 of 474).  Furthermore, the ALJ complied with the Commissioner's regulations, 20 C.F.R. § 416.920a(c)(3-4), (e)(2), and rated Plaintiff's functional limitations in the areas of daily activities, social function, concentration, persistence or pace, and episodes of decompensation.  Importantly, the ALJ's mental residual functional capacity finding was accompanied by a clear and satisfactory explanation of the basis on which it rests.  Plaintiff's mental impairment did not cause more than minimal functional restrictions, and the ALJ's determination that Plaintiff could perform a full range of sedentary work except that he was limited to simple, routine and repetitive tasks, was supported by the evidence.

Plaintiff takes issue with the ALJ's failure to include Dr. Konieczny's opinions with regard to his deficits in reading and writing, the need to lie down and a marked inability to handle the stress and pressures of work in assessing residual functional capacity.  The Magistrate finds at least four specific reasons why the ALJ did not give substantial deference to Dr. Konieczny's opinions in this regard.  First, Dr. Konieczny opined that Plaintiff has "diminished tolerance" for frustration and diminished coping ability to respond to pressure; not a marked limitation in his capacity to withstand stress (Docket No. 11, p. 438).  Second, Dr. Konieczny's opinion that Plaintiff needed to lie down was derived from a single clinical examination; he failed to provide adequate medical reasoning for adopting Plaintiff's suggestion that he needed to lie down during the day.  Third, Dr. Konieczny's records contain no history of diagnoses or treatment for stress-related anxiety that would interfere with Plaintiff's ability to work.  Fourth, the ALJ's findings that Plaintiff could perform only simple, repetitive, routine tasks is a proper accommodation for Plaintiff's difficulties with reading, writing and handling stress and pressures of work.

Significantly, the ALJ considered the relevant factors in the regulations regarding proper evaluation of the treating source evidence, weighing such factors as the length, nature, and extent of the particular treatment relationship.  He discussed, at length, Dr. Brown's single treatment, the diagnostic tests on which Dr. Brown relied and her assessment of Plaintiff's functional limitations.  The ALJ

attributed significant weight to Dr. Brown's opinions to the extent that they were consistent with the clinical and objective findings in the record.  The ALJ attributed minimal weight to Dr. Brown's suggestions that Plaintiff would need to lie down and miss work, as it was neither based on objective medical evidence nor based on sound medical judgment (Docket No. 11, p. 28 of 474).

In this Magistrate's view, the ALJ's assessment of Dr. Brown's opinions, considered along with the results of diagnostic tests conducted over the course of several years, complies with the Social Security Administration's requirements for evaluating the opinions of medical sources, as outlined above.  Simply stated, the written decision regarding the ALJ's treatment of Dr. Brown's opinions were made sufficiently clear to allow for meaningful review.  Since the ALJ's decision is based on substantial evidence, it will not be overturned.

## IX.  CONCLUSION

For the foregoing reasons, the Magistrate affirms the Commissioner's decision.

**IT IS SO ORDERED**.


/s/ Vernelis K. Armstrong
United Stats Magistrate Judge

Date:   October 24, 2014

.